**BRYAN CAVE LEIGHTON PAISNER LLP**
(Ashley) Hyun-Jeong Kim (Cal Bar No. 350856)
120 Broadway, Suite 300
Santa Monica, CA  90401-2386
Telephone: (310) 576-2100
Facsimile: (310) 576-2200
E-Mail:  ashley.kim@bclplaw.com

Charles E. Tompkins (*pro hac vice* forthcoming)
Darren E. Ray (*pro hac vice* forthcoming)
1155 F Street NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
E-Mail:  charles.tompkins@bclplaw.com
        darren.ray@bclplaw.com

*Counsel for Plaintiff FLEXTRONICS AP, LLC*

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLEXTRONICS AP, LLC, a Colorado limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER RICCI, an individual,<br><br>Defendant. | Case No.: 5:26-cv-00117<br><br>**COMPLAINT FOR:**<br><br>1) **BREACH OF FIDUCIARY DUTY;**<br>2) **FRAUD;**<br>3) **FRAUDULENT INDUCEMENT; AND**<br>4) **MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT (Cal. Civ. Code. §§ 3426 *et seq.*)**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Flextronics AP, LLC ("Flex AP") files this Complaint against Defendant Christopher Ricci ("Ricci"), and in support thereof alleges as follows:

## I.    INTRODUCTION

1.    This action arises from Defendant Ricci's and his company AutoConnect Holdings LLC's ("AutoConnect's") refusal since June 2025 to satisfy the terms of a Secured Convertible Promissory Note (the "Note," attached as Ex. 1), executed on May 20, 2015, and amended three or four times between May 2015 and June 2017.

2.    The terms of both the Note and the First Addendum to the Note (the "First Addendum") were the brainchild of Ricci.  Ricci, now one of the three owners of AutoConnect, was Deputy General Counsel and Chief Intellectual Property Officer for Flex Ltd. (together with its affiliates, including Flex AP, "Flex"), a multinational manufacturing corporation of over 140,000 employees across over 30 countries, when the Note was executed and the First Addendum conceived and drafted.

3.    In 2015 when the Note and Addendum were conceived, Ricci was the senior-most Flex attorney focused on intellectual property law at the time and was entrusted with final decision-making authority in this area for Flex.  As Ricci himself notes in his current LinkedIn page, Ricci served as the Chief Counsel to the Automotive, Industrial and Strategic Partnering business units at Flex.  (*See* Ex. 2.)  In that role, Ricci handled over half of Flex's commercial contracts and served as a member of Flex's legal leadership team.  Ricci thus both owed a fiduciary duty to act in Flex's best interests and was required to uphold his ethical obligations as Flex's attorney.

4.     Ricci, while at Flex, orchestrated the transfer of a Flex AP patent portfolio (the "Patents")—which Ricci had "invented" at Flex's expense while Ricci was supposed to be working full time as Flex's lead IP attorney—to AutoConnect, *a company that Ricci co-founded in 2015 during negotiations over the Note's terms* to hold the Patents at issue.

5.    Pursuant to the Note, Flex AP divested a patent portfolio in exchange for a $500,000 promissory note from AutoConnect, a preferred security interest in the Patents, and the option to convert Flex AP's indebtedness into Preferred Stock under certain circumstances.

6.    The purported concept behind the deal was, in exchange for convertible debt in

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

AutoConnect, Flex would transfer Flex AP's Patents to AutoConnect so that AutoConnect could locate an investor or investors that would invest in AutoConnect to develop the technology underlying the Patents and ultimately grow an automotive technology company. If this effort was successful, Flex AP had the ability to convert AutoConnect's indebtedness into 19.99% of AutoConnect's Preferred Stock. (*See* Ex. 1 §§ 4, 6.) Alternatively, if the effort was unsuccessful and AutoConnect failed to pay the amounts due, Flex AP had the ability to reclaim the Patents as the security interest for the Note.

7.    Unsurprisingly, given the obvious conflict of interest Ricci faced, the terms of the Note and the First Addendum—which Ricci devised—are unreasonably favorable to AutoConnect, for at least two reasons: (a) the AutoConnect transaction fails to include a grant back license to Flex AP (a standard provision); and (b) the First Addendum, discussed below, provides that Flex AP must reimburse AutoConnect for certain ongoing and ever-increasing patent maintenance costs and fees in the event Flex AP exercises its security interest in the Patents. Ricci proposed and pushed through the First Addendum during his last week as an employee (and fiduciary) at Flex, shortly before becoming one of the three owners of AutoConnect.

8.    Under the Note, Flex AP's "sole remedy" in the event AutoConnect failed to satisfy the Note within 10 days of a Flex AP demand for payment on or after the maturity date of the Note (thus triggering an "Event of Default") was to exercise Flex AP's security interest to recover the Patents. (*See id.* §§ 2, 3.)

9.    Several months after the Note was executed, however, in one of Ricci's final acts as a Flex employee and supposed fiduciary, Ricci devised and pressed for Flex AP's agreement to the First Addendum to the Note, which obliges Flex AP to reimburse AutoConnect for certain patent prosecution and maintenance fees should Flex AP ever exercise its security interest in the Patents. Ricci left Flex the week he prepared the First Addendum for signature—and was a confirmed part-owner of AutoConnect six months later.

10.    Worse, Ricci did not even include in the Note or the First Addendum a grant-back clause on Flex AP's own patent portfolio. In other words, AutoConnect theoretically could have sued Flex, Flex AP, or their customers for infringement of the Patents. Indeed, Ricci has now

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

caused AutoConnect to do so by commencing legal action against Flex and Flex AP customers Ford Motor Company ("Ford"), General Motors LLC ("GM"), and Toyota Motor Corporation and its affiliates ("Toyota"). The failure to include a grant-back license is inexcusable and inexplicable because even meritless patent infringement litigation costs a fortune to defend. No reasonable attorney acting in Flex's best interests would have proposed, let alone agreed to, the terms of the Note and the First Addendum.

11. Between late 2016 and the fall of 2017, Ricci—now operating from within AutoConnect—and his partners pressed for a series of extensions to the October 20, 2016, maturity date. That maturity date was eventually extended via a series of addendums to the Note until September 30, 2017.

12. As Ricci foresaw when devising the First Addendum, over time, Flex AP's ever-increasing reimbursement obligations vastly exceeded the value of the Promissory Note. Once that happened, Flex could only recover its investment if AutoConnect actually developed into an automotive technology company.

13. Thus, by 2017, when AutoConnect could not satisfy the payment obligation, Flex AP declined to demand payment, which inevitably would have triggered an Event of Default (and Flex AP's reimbursement obligations) 10 days later.

14. Rather than demand payment, Flex AP elected to retain its remaining rights pursuant to the agreement, including its potential right to Preferred Shares in the event of a change of control or initial public offering.

15. Nearly seven years later, in 2024, AutoConnect sued automakers Ford, GM, and Toyota, who are current, former, or potential Flex and Flex AP customers, for infringement of the Patents. This litigation placed Flex and Flex AP at immediate risk of potential financial and/or reputational harm.

16. On June 25, 2025, Flex AP sent AutoConnect a written Notice of Default, demanding that AutoConnect satisfy its obligations under the Note. (Ex. 3.)

17. AutoConnect failed to pay or transfer the Patents within 10 days, defaulting by July 5, 2025.

FLEXTRONICS AP, LLC'S COMPLAINT

18.     On July 10, 2025, AutoConnect notified Flex AP that AutoConnect considered Flex AP's demand untimely, and that AutoConnect refused to either pay the amounts owed pursuant to the Note or return the Patents to Flex AP.  (Ex. 4.)

19.     AutoConnect's non-payment following Flex AP's demand triggered an Event of Default pursuant to the Note.  Flex AP therefore notified AutoConnect of its default and demanded transfer of the Patents.  Flex AP also invited AutoConnect to identify any amounts it believed Flex AP was obligated to reimburse AutoConnect pursuant to the First Addendum.

20.     On August 27, 2025, Flex AP sent AutoConnect a letter demanding that AutoConnect return the Patents to Flex AP.

21.     AutoConnect responded on September 8, 2025, refusing to transfer the Patents to Flex AP.

## II.     THE PARTIES

22.     Plaintiff Flex AP is a Colorado limited liability company with its principal place of business at 6201 America Center Drive, San Jose, CA 95002.

23.     Flex AP is a subsidiary of Flex Ltd., a Singapore-based multinational electronics manufacturing services (EMS) and original design manufacturer (ODM) company.  Flex manufactures electronic products and other goods at its manufacturing facilities in the United States and abroad spanning 30 countries with approximately over 140,000 employees.  These facilities manufacture a broad array of products sold for automotive, consumer, medical, aerospace, and data center applications, among others.  Many of these products are electrical or electronic.  Products manufactured by Flex are sold in the United States and around the world, including to United States automakers.

24.     On information and belief, Defendant Ricci is an individual residing in Marco Island, FL, and is a co-owner of AutoConnect.  On information and belief, Ricci is a registered patent attorney with the United States Patent and Trademark Office ("USPTO") since 1994.  A copy of Ricci's registration record available from the USPTO's patent practitioner database is attached as Ex. 5.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

### III.    VENUE AND JURISDICTION

25.    The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between the Plaintiff and the Defendant, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

26.    Flex AP's members are citizens of Texas and Delaware.

27.    On information and belief, Ricci is domiciled in Florida.

28.    The Court has personal jurisdiction over Ricci because, as part of Ricci's employment with Flex, he signed an Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement (the "Employee Proprietary Information Agreement") on April 11, 2011. (Ex. 6.)

29.    Specifically, Ricci agreed to the following provision in Section 15.1 of the Employee Proprietary Information Agreement:

> This Agreement will be governed by and construed according to the laws of the State of California as such laws are applied to agreements entered into and to be performed entirely within California between California residents. I hereby expressly understand and consent that my employment with the Company whether or not I am physically located in California is a transaction of business in the State of California and constitutes the minimum contacts necessary to make me subject to the personal jurisdiction of the state and federal courts located in the State of California for any lawsuit filed against me by Company arising from or related to this Agreement.

(*Id.* § 15.1.)

30.    The Court is the proper venue for this case under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### IV.    DIVISIONAL ASSIGNMENT

31.    The lawsuit arose in Santa Clara County, California, so it should be assigned to the San Jose Division of this Court.

### V.    STATEMENT OF FACTS

**A.    The Patents.**

32.    The Patents list Ricci as the named inventor and were initially sought while Ricci was employed by Flex.  The Patents were described as connected vehicle infotainment and security

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

technologies, including: (1) custom display layouts, settings, and/or infotainment based on the recognition of an occupant in a vehicle; (2) content sharing between vehicle displays; (3) home automation via vehicle data such as geographical location; (4) transferring navigation data from user devices to vehicles; (5) gesture-based vehicle controls; (6) vehicle-to-vehicle safety communications; and (7) automated vehicle control in traffic.

### B.    Terms of the Note and Related Documents.

33.    The relevant documents to this transaction are the Patent Assignment Agreement (the "Assignment," Ex. 7), the Side Letter, and the Note and its addendums (the "Addendums").

### a)    Patent Assignment.

34.    On May 20, 2015, Flex AP and AutoConnect entered into the Assignment.  (*See* Ex. 7.)

35.    Pursuant to the Assignment, Flex AP assigned, transferred, and conveyed to AutoConnect "all right, title, and interest in and to the Patents."  (*Id.* § 1.)

36.    The Patents were a list of patents and patent applications attached to the Assignment as Exhibit A.  (*Id.*, Ex. A.)

### b)    Secured Convertible Promissory Note.

37.    As payment for the Assignment, Flex AP and AutoConnect entered into the Note on May 20, 2015.  (*See* Ex. 1 at 1.)

38.     Pursuant to the Note, AutoConnect promised to pay Flex AP "the principal sum of Five Hundred Thousand and no/100 Dollars ($500,000), together with interest from the date of this Secured Convertible Promissory Note . . . on the unpaid principal balance at a rate equal to 5% per annum, computed on the basis of the actual number of days elapsed and a year of 365 days."  (*See id.*)

39.    The Note's maturity date was October 20, 2016, upon which date the "unpaid principal, together with any then unpaid and accrued interest" was due and payable. (*See id.*)  After October 20, 2016, Flex AP had the option to demand payment and potentially, if payment was not made within 10 days, trigger an "Event of Default."

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

FLEXTRONICS AP, LLC'S COMPLAINT

40.     An "Event of Default" occurred where AutoConnect failed to satisfy its obligations under the Note within 10 days of a Flex AP demand for payment made on or after the maturity date. There are thus three conditions for an "Event of Default": (1) the passage of the maturity date; (2) a demand by Flex AP for payment; and (3) failure by AutoConnect to satisfy its obligation within 10 days of Flex AP's demand.  (*See id.* § 2(a).)

41.     If an Event of Default occurred, the Note provided that Flex AP's "sole remedy" is "transfer of the Collateral" and payment by AutoConnect "of any fees, costs and expenses associated with the executing upon such security interest."  (*See id.* § 3.)

42.     AutoConnect also agreed "to pay all costs and expenses, including reasonable attorney's fees, incurred in connection" with an action "to collect on this Note."  (*See id.* § 10.)

43.     The Note granted Flex AP a security interest in all of AutoConnect's "personal property and assets (both tangible and intangible)," including substitutions for, additions and accessions to, and proceeds of those assets.  (*See id.* §§ 5, 6.)

44.     If AutoConnect was successful in its efforts to obtain investors to invest in the development of the Patents by "issu[ing] and sell[ing] shares of its Preferred Stock for aggregate gross proceeds of at least $5,000,000.000" prior to the maturity date, AutoConnect's indebtedness would convert into shares of AutoConnect "Preferred Stock."  (*See id.* §§ 4(a), 6.)

45.     Following the maturity date, the Note allows Flex AP to elect to have the unpaid principal and interest under the Note converted to AutoConnect stock "at a price per share equal to the lower of (A) the fair market value per share negotiated in good faith by the parties hereto based upon the condition of the Company at the time of such conversion or (B) the price per share calculated such that this Note converts into shares representing 19.99% of the Company's equity securities, calculated on a fully-diluted basis."  (*See id.* § 4(b).)

46.     Additionally, under the terms of the Note, AutoConnect agreed not to "sell or otherwise dispose of any of the Collateral, except in the ordinary course of business" unless it had the "prior written consent" of Flex AP.  (*See id.* § 7(b)(iv).)

///

///

FLEXTRONICS AP, LLC'S COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**C.**      **Negotiation and Addendums.**

47. Ricci directed the drafting and negotiation of the Note, its various Addendums, and related agreements identified above on behalf of Flex AP.

48. Upon information and belief, Ricci also—unbeknownst to Flex AP—directed the negotiation of the same documents for AutoConnect. Ricci thus effectively acted as the lead attorney for both sides in the transaction.

49. In mid-June 2015, on his own initiative, Ricci instructed others at Flex AP to pay AutoConnect's patent maintenance fees, citing AutoConnect's funding issues, to ensure that Flex AP, rather than AutoConnect, continued to pay annuities and other prosecution payments. By doing this, Ricci prioritized AutoConnect's interests over Flex AP's interests. This was in clear violation of Ricci's ethical duties as Flex's lawyer, including violations of Rule 1.7 of the California Rules of Professional Conduct.

50. On June 18, 2015, Ricci, on his own initiative, authorized Flex AP to pay annuities and other prosecution expenses for AutoConnect.

**a)**      **First Addendum.**

51. The First Addendum was agreed upon in principle by Flex AP and AutoConnect prior to Ricci's departure. Upon information and belief, Ricci—unbeknownst to Flex AP—acted as lead counsel on behalf of both sides of the transaction.

52. The First Addendum was executed by Flex AP shortly after Ricci's departure from Flex, and by AutoConnect on October 22, 2015. (*See* Ex. 8.)

53. The First Addendum provides that: "In the Event of Default and [Flex AP] must execute its security interest in the Collateral, the parties agree that [Flex AP] will reimburse [AutoConnect] for any costs incurred by [AutoConnect] prior to the Event of Default for the fair and reasonable prosecution of patents and patent applications listed as Purchased Assets, as well as any continuations, divisionals, or continuations-in-part derived therefrom." (*See id.*)

54. Ricci and AutoConnect obtained Flex AP's agreement to the First Addendum by falsely representing to Flex AP that AutoConnect was nearing a deal with potential investors and that Flex AP's obligation to reimburse AutoConnect for certain costs was necessary to close on the

investment opportunity.  Upon information and belief, there was no potential near-term investor interested in the Patents at that time.

55.     It is reasonable under the circumstances to infer that Ricci and AutoConnect's primary motivation for proposing and persuading Flex AP to sign the First Addendum was to drive up the costs Flex AP would be required to reimburse AutoConnect in the event Flex AP ever executed on its security interest and to thereby deter Flex AP from executing its security interest and reclaiming the Patents.

**b)     Second Addendum.**

56.     Upon information and belief, the Second Addendum to the Secured Promissory Note (the "Second Addendum") extended the maturity date of the Note.

**c)     Third Addendum.**

57.     The Third Addendum to the Secured Promissory Note (the "Third Addendum") was executed by Flex AP and AutoConnect on March 17, 2017.  (*See* Ex. 9.)

58.     The Third Addendum changed the maturity date of the Note to July 30, 2017.

59.     It is reasonable under the circumstances to infer that Ricci and AutoConnect's primary motivation for extending the maturity date was to drive up the costs Flex AP would be required to reimburse in the event Flex AP ever executed on its security interest. Essentially, to make it less likely that Flex AP would ever want to take the Patents back.

**d)     Fourth Addendum.**

60.     The Fourth Addendum to the Secured Convertible Promissory Note (the "Fourth Addendum") was executed by Flex AP and AutoConnect on June 30, 2017.  (*See* Ex. 10.)

61.     The Fourth Addendum changed the maturity date of the Note to September 30, 2017. (*See id.*)

62.     It is reasonable under the circumstances to infer that Ricci and AutoConnect's primary motivation for extending the maturity date was to drive up the costs Flex AP would be required to reimburse in the event Flex AP ever executed on its security interest.

///

///

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

FLEXTRONICS AP, LLC'S COMPLAINT

**D.      Ricci's Prior Collaborations with AutoConnect's Co-Owners, Suorsa and Hershenson.**

63.     In the late 1990s, Ricci began collaborating with serial entrepreneur Suorsa, laying the foundation for a partnership that later extended into automotive technology.  On information and belief, Suorsa founded several companies focused on new and emerging technologies.

64.     In 2001, Ricci worked at NCR Corporation, where he developed and managed the company's IP portfolio, which he later collaborated with Suorsa to further develop.  Ricci eventually left NCR, and Suorsa took over the CEO position of Prime Technologies, a subsidiary of NCR, where he developed anti-counterfeiting technology.

65.     On information and belief, in 2001, Ricci also began collaborating with Hershenson, a businessman with a background in technology and venture capital.  On information and belief, Hershenson has founded several companies, including DocBox Inc., WaveGuide Corporation, and New Technology Ventures.

66.      Ricci began his employment with Flex on or about April 11, 2011.  Ricci joined Flex as Deputy General Counsel and Chief Intellectual Property Officer, tasked with overseeing patent prosecutions and safeguarding Flex's intellectual property.  Ricci was the senior-most attorney at Flex focused on intellectual property matters.

67.     As Flex's counsel, Ricci owed Flex and Flex AP a fiduciary duty to act solely in Flex and Flex AP's best interests.

68.     Beginning no later than late 2014, Ricci began collaborating with his colleagues Suorsa and Hershenson for the benefit of the three of them as future owners of AutoConnect rather than for the benefit of Flex or Flex AP.

**E.      Development of the Patents and Ricci's Role.**

69.     Prior to Ricci's employment, Flex AP had initiated a patent development incentive plan, offering substantial bonuses per patent to encourage employee innovation.  Ricci administered this patent development incentive plan on behalf of Flex after he joined Flex.

70.     Ricci, by far, benefited the most from this program.  Ricci submitted numerous patent applications for technologies like automotive interfaces.  On information and belief,

10

FLEXTRONICS AP, LLC'S COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

approximately 50 of those applications were rejected by USPTO patent examiners and abandoned. Ricci received the bonus for a patent even if the patent application was denied. On information and belief, Ricci was paid hundreds of thousands of dollars in total pursuant to this bonus program.

71. Flex eventually overhauled and terminated the program due to concerns about Ricci's abuse of the program.

**F.      The Topi Project and the Effort to Monetize the Patents.**

72. Flex and Flex AP developed the Patents through the "Topi" project, led by Ricci, focusing on vehicle connectivity and occupant health monitoring.

73. Ricci was the primary "inventor" for the Patents, meaning he was in a particular place of trust with respect to advising Flex and Flex AP about the Patents. Additionally, as leader of the Topi project, Ricci oversaw its patent portfolio and made operational decisions, including those regarding patent applications and maintenance.

74. The Topi project, also referred to internally as FA3 and Octopus, formed the nucleus of what would eventually become AutoConnect, which is jointly owned by Ricci, Suorsa, and Hershenson.

75. Following Ricci's filing of the Patents, Flex and Flex AP recognized that commercializing software and data-centric technologies were outside its core strengths in electronics design and manufacturing. As a result, Flex and Flex AP sought to spin out Topi to attract investment while retaining a strategic relationship, including manufacturing partnerships and a potential 19.99% equity state in the spun-out entity. This approach was intended to leverage Flex's manufacturing capabilities while enabling Topi to attract investment. Ricci led the effort to locate an investor or investors for Topi.

76. During this time, Flex and Flex AP funded Topi's efforts to develop the Patents, submit patent applications, and maintain the Patent portfolio.

77. Ricci, however, intended from the outset to use Topi for his own personal gain rather than for the benefit of Flex or Flex AP.

78. On November 8, 2013, Ricci introduced Hershenson to Flex executives, exploiting Flex resources to advance his personal venture.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

11

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

79. By March 2014, Ricci pitched a plan to venture capitalist Jason Henrichs ("Henrichs") of Kinetic Group, to spin out Topi, seeking third-party investment while committing Flex to $2 million in funding, contingent on investor interest.

80. Ricci planned to remain Flex's Deputy General Counsel and Chief Intellectual Property Officer and serve as General Counsel for another spin-out owned by Flex, Elementum, all while he simultaneously chaired Topi with aspirations to become its CEO.

81. In an April 23, 2014, email to Henrichs, Ricci revealed his intent: "So, now that you have a chance to study it and given that every car company in the world is trying to build one of these, do you think I'm a fool for considering **going out the door with it**?" (Emphasis added.)

82. Henrichs responded, outlining a scheme: "I'd argue at this stage the right path is: Get Flex to invest a small amount of your team energy to prep this for spin out[.] Recruit a small leadership team with auto experience in the Detroit Area[.] … [Y]ou become board chair which helps Flex monitor this and you take some equity as compensation for the work outside of Flex hours … **As the product gets close to launch, you take the reigns [*sic*] as CEO**." (Emphasis added.)

83. On April 24, 2014, Ricci detailed his plan: "1. Get Flex to commit to the terms of their participation. My email last week describing the proposal was for that purpose. 2. I would engage Gregg H as the 'banker' … 3. While doing that, I would actually stay with Flex and also be GC for … Elementum. 4. Once funded, I would continue with Elementum and also be chair of FA3. I would work it out so that it was an active chair and may even hold title of CEO at that time, but it would not be a fulltime gig. 5. **When the product launches, I would move over**." (Emphasis added.)

**G.   Ownership and History of AutoConnect.**

84. On June 13, 2014, Topi Systems, Inc. ("Topi Systems") was incorporated. Ricci was named President. The Patents were then transferred from Flex AP to Topi Systems.

85. Ricci pushed for a spin-out of Topi Systems. Investment proposals noted that, "Commercializing Topi Systems does not play to Flex strengths. By spinning out Topi Systems

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

with a continued Flex strategic relationship, the technology can rapidly become a significant player in the rapidly evolving Internet of Things space."

86. Ricci spent 2014 trying to identify and engage potential investors in Topi Systems.

87. By January 8, 2015, funding efforts had stalled. Ricci wrote to Hershenson's colleagues at New Tech Ventures about the upcoming deadline to spin out Topi Systems: "I have already been thinking about backup plans. I think that there may be ways to save the deal if we miss the deadline, but they do not include me **in the short term**." (Emphasis added.) "I will have to make a one-year commitment to another project. I would very much like to see this one through though." The phrase "in the short term" indicates that from the outset Ricci saw himself as a beneficiary of the sale of the Patents to AutoConnect. Ricci did not, however, advise Flex or Flex AP of his expectation that he would benefit from the sale of the Patents to AutoConnect.

88. On January 12, 2015, Ricci emailed Henrichs and Suorsa: "I have been talking to Peter [Suorsa] about '**selling**' him the technology and IP so you guys can continue." (Emphasis added.)

89. On January 21, 2015, Ricci wrote to Suorsa: "I have also started the process of '**selling**' Topi to you. I will know in … about a month if I can pull it off." (Emphasis added.)

90. It is noteworthy that Ricci wrote the word "selling" in quotes in both emails. The use of quotes strongly suggests that as early as January of 2015, Ricci intended for the AutoConnect deal to be a sham sale, even as Ricci remained the lead IP counsel for Flex, entrusted to protect Flex and Flex AP's best interest with respect to the Patents. This created a clear conflict of interest in violation of Rule 1.7 of the California Rules of Professional Conduct.

91. On February 8, 2015, Suorsa suggested to Ricci that they "involve Greg Hershenson on the Topi side of things." This was a redundant proposal given Hershenson's prior involvement in the enterprise, and it suggests a pretext to formalize their scheme.

92. A week and a half later, on February 19, 2015, Ricci proposed to Hershenson that they create AutoConnect to acquire Topi Systems's assets, bypassing acquisition of the company itself: "I am questioning whether it makes more sense for you to **just create your own shell and transfer the assets into it**, rather than dealing with the acquisition of a company (Topi). It makes

the sale cleaner too." (Emphasis added.) Hershenson promptly replied, "The company will be called AutoConnect Holdings LLC."

93.    Ricci was personally involved in the formation of AutoConnect and even advised Suorsa regarding selection of counsel and the corporate technicalities necessary to shield Suorsa, Hershenson, and Ricci from eventual liability in the event of litigation.

94.    The next day, on February 20, 2015, Ricci and Suorsa discussed using AutoConnect's corporate form to shield their liability. Ricci stated "You have to realize that the main thing we are concerned about is not the litigation. It is coming one way or another. The main concern is that **they can't pierce the corporate veil**. As a result, your corporate lawyer could even become witnesses in the case." (Emphasis added.)

95.    Three days later, on February 23, 2015, Ricci signed Topi Systems's Certificate of Dissolution, paving the way for AutoConnect's gain. The Patents at issue then reverted from Topi Systems to Flex AP.

96.    Three days later, on February 26, 2015, AutoConnect was incorporated in Delaware.

97.    On information and belief, by the time AutoConnect was incorporated, Ricci had already reached a deal with Suorsa and Hershenson that Ricci would become a one-third owner of AutoConnect shortly after leaving Flex. This prior agreement, which was not communicated to Flex AP, is the reason Ricci arranged for, promoted to Flex AP, and implemented the sale of the Patents to AutoConnect.

98.    Ricci then oversaw the negotiations between Flex AP and AutoConnect over the terms of the sale of the Patents to AutoConnect. Ricci purported to act on behalf of Flex AP while at the same time acting on behalf of and for the benefit of AutoConnect and, subsequently, Ricci himself in his personal capacity.

99.    Ricci directed the negotiation and drafting of the Note and related documents. Although Ricci's subordinate Rob Cronan drafted many of the documents, he did so at Ricci's direction and under Ricci's control. At no point did Ricci inform Flex AP of Ricci's financial interest in AutoConnect or the fact that Ricci was also providing legal advice to AutoConnect. As

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

noted above, this conflict of interest was in violation of several ethical rules governing Ricci's conduct as Flex and Flex AP's lawyer.

100.    On information and belief, Ricci knew that his self-dealing and misrepresentations to Flex and Flex AP were likely to lead to future legal challenges to AutoConnect's ownership of the Patents. Ricci's concern statement that the "litigation is coming one way or another" suggests that Ricci knew his conduct during the AutoConnect transaction would lead to future litigation against AutoConnect.

101.    On information and belief, Ricci further intended to use the First Addendum as a poison pill to deter Flex AP from reclaiming the Patents. Ricci intended from the outset that the First Addendum's reimbursement obligation would induce Flex and Flex AP to forego its security interest and allowing Ricci and AutoConnect to obtain the Patents for free.

102.    On May 20, 2015, Ricci's scheme resulted in the transfer of the Patents to AutoConnect for the Note, with no license for Flex, Flex AP, or their customers to practice Flex and Flex AP's Patents.

103.    As Flex's Deputy General Counsel and Chief Intellectual Property Officer, Ricci drove the transaction and signed off on the terms of the transfer.

104.    Rob Cronan was a subordinate to Ricci at the time of the AutoConnect transaction. Cronan acted at Ricci's direction and under his control with regard to the transaction. Cronan was not informed at the time he worked on the Note or the First Addendum that Ricci had a financial interest in AutoConnect, that Ricci expected shortly to be a part owner of AutoConnect, or that Ricci was at the same time advising AutoConnect and its principals regarding the transaction.

105.    Likewise, Tim Stewart ("Stewart"), an authorized Flex and Flex AP signatory, signed the AutoConnect transaction documents in reliance on Ricci's subordinate's representations regarding the transaction and on Ricci's good faith and fiduciary obligation to Flex and Flex AP. Stewart was not informed at the time he signed the Note or the First Addendum that Ricci had a financial interest in AutoConnect, that Ricci expected shortly to be a part owner of AutoConnect, or that Ricci was at the same time advising AutoConnect and its principals regarding the transaction.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

**H.      Ricci's Departure and Ownership in AutoConnect.**

106.    On August 31, 2015, Ricci notified Flex of his intent to resign.

107.    On September 3, 2015, Ricci instructed Flex employees that Flex should continue paying AutoConnect's patent and prosecution maintenance fees.  By this point, Ricci had an agreement to be a part owner of AutoConnect, meaning Ricci's direction to Flex employees on this point was effectively an instruction for Flex to pay fees for Ricci's own gain.  Yet Ricci never disclosed his conflict to anyone at Flex.

108.    Sometime between September 3, 2015, and September 18, 2015, Ricci presented Flex attorney Ben Tabler ("Tabler"), who was another direct report of Ricci's at the time, with a draft of the First Addendum and instructed Tabler to ask Flex and Flex AP's authorized signatory Stewart to sign the First Addendum on behalf of Flex AP.  The First Addendum obligates Flex AP to reimburse AutoConnect for certain patent maintenance fees should Flex AP ever declare an Event of a Default.

109.    Ricci actively pushed for the First Addendum to ensure AutoConnect's patent prosecution and maintenance fees would be reimbursed by Flex AP upon exercising its security interests.  This presented Flex a lose-lose scenario: either take no action in response to AutoConnect's failure to pay the amounts due to Flex or reacquire the Patents and reimburse AutoConnect for the maintenance costs.  The First Addendum was Ricci's brainchild; Ricci instructed his subordinate Tabler to ask Stewart to sign the First Addendum.

110.    Again, given Ricci's agreement to be a part owner of AutoConnect, Ricci was by this point effectively advocating for Flex or Flex AP to reimburse fees to Ricci and his partners Suorsa and Hershenson.  But Ricci at no point disclosed this conflict—which would have triggered far greater scrutiny of the transaction—to Flex or Flex AP.

111.    The First Addendum effectively reduced the value of the Note to Flex AP to zero, because the Addendum created an escalating Flex AP liability for covered patent prosecution fees and costs should Flex AP ever seek to recover the Patents.  It was entirely predictable to a trained patent lawyer, and Ricci must have known, that by mid-2017 Flex AP's reimbursement obligation likely would equal or perhaps even exceed $500,000.  Because Ricci was the only trained patent

FLEXTRONICS AP, LLC'S COMPLAINT

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

lawyer involved in the transaction on Flex's behalf, however, Flex (apart from Ricci) did not appreciate the unfairness and imbalance the First Addendum reflected.

112.   On September 18, 2015, Tabler presented the First Addendum to Stewart for signature and informed Stewart that Ricci wanted to get the Addendum signed.  Stewart served as an authorized signatory for Flex and Flex AP.  Consistent with this role, Stewart did not conduct any independent investigation into the nature of the transaction.  Stewart signed the First Addendum based on Ricci's instruction—conveyed through Tabler—that the deal should be signed.

113.   On September 25, 2015, Ricci left Flex.

114.   Upon his departure, Ricci improperly retained confidential Flex and Flex AP information.  On information and belief, Ricci retained approximately 1,700 Flex and Flex AP documents.

115.    The confidential Flex and Flex AP information that Ricci retained after his employment terminated included, among other things: confidential source code; internal slide decks; pitch materials; cost and revenue models; agreements; and client communications.

116.   On information and belief, AutoConnect could not have continued as a going concern without Ricci's retention of these confidential Flex and Flex AP documents, which formed the foundation of AutoConnect's business model.

117.   As part of Ricci's employment, Ricci signed Flex's Employee Proprietary Information Agreement. (Ex. 6.) Section 11 of that agreement provides:

> When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, client/customer lists and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company. I further agree to return any and all other tangible or intangible property of the Company's.

118.   Stewart signed the First Addendum sometime between Monday, September 28, 2015, and October 21, 2015.

119.   On October 22, 2015, the First Addendum was executed by AutoConnect.

///

**I.      AutoConnect's Breaches and Litigation.**

120.    Ricci caused AutoConnect to seek and to receive extensions on the Note via the Third and Fourth Addendums to the Note.  The Note's maturity date was extended to September 30, 2017, pursuant to the Fourth Addendum.

121.    However, Flex AP retained the rights to partial potential ownership set forth in the Note past the September 30, 2017, maturity date.

122.    On September 30, 2017, when the Note was due pursuant to the Fourth Addendum, AutoConnect was unable or unwilling to pay the amounts owed.

123.    On November 16, 2017, Flex AP proposed licensing rights in exchange for an extension, but AutoConnect refused.

124.    Following discussion between Flex AP and AutoConnect, Flex AP elected not to demand payment and thereby trigger an Event of Default, preferring instead to retain the various rights available to Flex AP under the Note, including the right to repayment, collection of the collateral, and the opportunity presented in the event of some future substantial investment in AutoConnect.

125.    In 2024, Ricci caused AutoConnect to sue automakers Ford, GM, and Toyota for patent infringement.  Ford and GM are two of Flex's important customers.  In its litigation against Ford, AutoConnect asserts that Ford's SYNC system, which Flex supplied to Ford, infringes some of the Patents.

126.    In 2025, following notice of the litigation against the automakers, Flex began an investigation into the circumstances of the AutoConnect transaction.  This investigation included reviewing documents related to the litigations and Ricci's time at Flex.

127.    On June 25, 2025, Flex AP sent AutoConnect a written Notice of Default, demanding that AutoConnect satisfy its obligations under the Note.  (Ex. 3.)

128.    Ricci caused AutoConnect to fail to pay or transfer the Patents within 10 days, thereby causing AutoConnect to default by July 5, 2025.

129.    On July 10, 2025, AutoConnect refused to return the Patents or pay the Note.  (Ex. 4.)

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

18

130.    On August 27, 2025, Flex AP sent AutoConnect a letter demanding that AutoConnect return the Patents to Flex AP.

131.    On September 8, 2025, AutoConnect again refused to return the Patents.

**J.    Fraudulent Concealment.**

132.    Ricci, secretly working on behalf of AutoConnect rather than Flex AP, willfully and fraudulently concealed material facts regarding the AutoConnect transaction from Flex AP. These included: the extent and nature of his relationship with the principals of AutoConnect; Ricci's expected investment in AutoConnect; Ricci's activities on behalf of AutoConnect during the negotiation process, such as assisting in its selection of counsel; Ricci and AutoConnect's joint scheme to structure the transaction to favor AutoConnect at Flex's expense; and AutoConnect's intent to pursue litigation as a patent infringement plaintiff rather than seek bona fide investors.

133.    As a result of Ricci's concealment of material facts, Flex and Flex AP did not discover Ricci's self-dealing until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them. Documents reviewed as part of Flex AP's investigation revealed an orchestrated scheme to transfer the Patents to AutoConnect for minimal consideration. Flex and Flex AP could not have reasonably discovered its claims (Counts I through IV, *infra*) until 2025. Prior to being notified by Ford, GM, and Toyota of Ricci's alleged conduct, and reviewing documents in preparation for and in response to a third-party subpoena from GM and Toyota, Flex AP reasonably relied on Ricci's representations as Flex's Deputy General Counsel and Chief Intellectual Property Officer and had no occasion to investigate potential malfeasance by Ricci.

134.    Ricci willfully and purposefully withheld and concealed material information about the AutoConnect transaction and its purpose.

135.    As a result of Ricci's fraudulent and willful concealment of their scheme, the running of any statute of limitations has been tolled with respect to any claims that Flex AP has against Ricci as a result of the unlawful conduct alleged herein.

///

///

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

## COUNT I

### Breach of Fiduciary Duty

136. Flex AP incorporates and realleges by reference the allegations above as if fully set forth herein.

137. Ricci, as the Deputy General Counsel and Chief Intellectual Property Officer of Flex, owed Flex and Flex AP fiduciary duties of care, loyalty, and good faith. These duties required Ricci to act in Flex and Flex AP's best interests, avoid self-dealing, and protect Flex and Flex AP's intellectual property interests, including in the Patents.

138. Ricci knowingly accepted these fiduciary duties through his employment as an attorney with Flex and role overseeing patent prosecutions and Flex and Flex AP's IP assets.

139. Ricci breached these fiduciary duties through a calculated scheme, including:

    a. Orchestrating the transfer of the Patents to AutoConnect, a company he co-founded, for effectively no consideration;

    b. Misrepresenting the transfer's purpose as seeking investors to develop a product company, when he intended to use AutoConnect as a patent infringement plaintiff;

    c. Omitting a license for Flex AP in the Assignment and the Note, stripping Flex and Flex AP of rights to practice its own Patents;

    d. Authorizing Flex AP to pay AutoConnect's patent maintenance fees both by his instruction and via the First Addendum so that Flex AP would pay the fees and expenses without ensuring reimbursement, prioritizing AutoConnect's interests;

    e. Structuring the First Addendum to deter Flex AP from reclaiming the Patents even in the face of AutoConnect's failure to pay the amount under the Note;

    f. Concealing from Flex and Flex AP his conflicts of interest and coordinating with Suorsa and Hershenson to form AutoConnect to acquire the Patents, as evidenced by his communications about "selling" the technology to AutoConnect and using AutoConnect's corporate form to shield liability, violating ethical obligations as Flex's counsel; and

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

20

g. Causing AutoConnect to refuse to satisfy the Note or return the Patents after Flex AP's demand.

140. Ricci's breaches were willful, intentional, and in bad faith, driven by self-interest and executed with deliberate disregard for Flex and Flex AP's interests or rights, violating Ricci's duties of loyalty to Flex and Flex AP as both current and former clients. In addition, Ricci's actions were in violation of ethical rules governing Ricci's conduct as a lawyer, including Rules 1.7 and 1.8.1 of the California Rules of Professional Conduct.

141. Ricci willfully and fraudulently concealed material facts, including: by misrepresenting the transfer's purpose as seeking investors to develop a product company when he intended to join AutoConnect and use AutoConnect as a patent infringement plaintiff; and falsely representing the Note was adequate consideration for the Patents and in Flex and Flex AP's best interest while concealing his personal stake in AutoConnect. This prevented Flex and Flex AP from discovering the breach until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them, tolling the four-year statute of limitations (Cal. Code Civ. Proc. § 343) under the discovery rule and equitable tolling principles.

142. As a direct and proximate result of the foregoing breaches of Ricci's fiduciary duties, Flex AP has suffered substantial harm and damages, including: the loss of the Patents, potential exposure to third-party claims from automakers that are current, former, or potential Flex or Flex AP customers, and the inability to use or license the Patents, with damages to be proven at trial.

143. In doing the acts alleged in this Complaint, Ricci acted with fraud and/or malice as defined in Cal. Code Civ. § 3294, therefore entitling Flex AP to punitive damages and attorney's fees and costs.

## **COUNT II**

### **Fraud**

144. Flex AP incorporates and realleges by reference the allegations above as if fully set forth herein.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

145. Ricci knowingly made false representations or omissions of material fact to Flex AP, including:

    a. Falsely representing the Note as modified by the First Addendum was adequate consideration for the Patents and in Flex AP's best interest, and by concealing his personal stake in AutoConnect;

    b. Misrepresenting the transfer's purpose as seeking investors to develop a product company, when he intended to use AutoConnect as a patent infringement plaintiff;

    c. Omitting a license for Flex AP in the Assignment and the Note, stripping Flex and Flex AP of rights to practice its Patents;

    d. Pursuing a Topi spin-out for personal gain while still employed by Flex, planning to join AutoConnect as shareholder;

    e. Authorizing Flex AP to pay AutoConnect's patent maintenance fees both by his instruction and via the First Addendum so that Flex AP would pay the fees and expenses without ensuring reimbursement, prioritizing AutoConnect's interests;

    f. Structuring the First Addendum to deter Flex AP from reclaiming the Patents;

    g. Concealing his conflicts of interest and coordinating with Suorsa and Hershenson to form AutoConnect to acquire the Patents, as evidenced by his communications about "selling" the technology to AutoConnect and using AutoConnect's corporate form to shield liability, violating ethical obligations as Flex's counsel; and

    h. Causing AutoConnect to refuse to satisfy the Note or return the Patents after Flex's AP's demand.

146. Ricci made these misrepresentations or omissions with the intent to deceive Flex AP, including the Patent transfer.

147. Flex AP reasonably relied on Ricci's representations and omissions, given his trusted role and fiduciary duties.

148. Ricci willfully and fraudulently concealed material facts, including: by misrepresenting the transfer's purpose as seeking investors to develop a product company when he intended to join AutoConnect and use AutoConnect as a patent infringement plaintiff; and falsely representing the Note was adequate consideration for the Patents and in Flex and Flex AP's best interest while concealing his personal stake in AutoConnect. This prevented Flex and Flex AP from discovering the fraud until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them, tolling the three-year statute of limitations (Cal. Code Civ. Proc. § 338(d)) under the discovery rule and equitable tolling principles.

149. As a direct and proximate result of Ricci's fraud, Flex AP has suffered substantial harm and damages, including: loss of the Patents, incurrence of unreimbursed patent expenses, and exposure to third-party claims by automakers who are current, former, or potential Flex or Flex AP customers, with damages to be proven at trial.

150. In doing the acts alleged in this Complaint, Ricci acted with fraud and/or malice as defined in Cal. Code Civ. § 3294, therefore entitling Flex AP to punitive damages and attorney's fees and costs.

## COUNT III

### Fraudulent Inducement

151. Flex AP incorporates and realleges by reference the allegations above as if fully set forth herein.

152. Ricci fraudulently induced Flex AP to enter into the Assignment, the Note, and the First Addendum by:

    a. Falsely representing the Note as modified by the First Addendum was adequate consideration for the Patents and in Flex AP's best interest, and by concealing his personal stake in AutoConnect; and

    b. Misrepresenting the transfer's purpose as seeking investors to develop a product company, when he intended to use AutoConnect as a patent infringement plaintiff.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

153.   Ricci made these representations or omissions with the intent of inducing Flex AP to enter into the Assignment and the Note, knowing they were false and misleading.

154.   Flex AP reasonably relied on Ricci's representations and omissions, given his position as trusted counsel and his fiduciary duties to act in Flex AP's best interests.

155.   Ricci willfully and fraudulently concealed material facts, including: by misrepresenting the transfer's purpose as seeking investors to develop a product company when he intended to join AutoConnect and use AutoConnect as a patent infringement plaintiff; and falsely representing that the terms of the Note, as modified by the First Addendum, were in Flex AP's best interest while concealing from Flex, Flex AP, Flex and Flex AP's authorized signatory Stewart, and Ricci's colleagues and superiors his personal stake in AutoConnect. This prevented Flex and Flex AP from discovering the fraudulent inducement until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them, tolling the statute of limitations (Cal. Code Civ. Proc. § 338(d)) under the discovery rule and equitable tolling principles.

156.   As a direct and proximate result of Ricci's fraudulent inducement, Flex AP entered into the Assignment and the Note and has suffered substantial harm and damages, including: the loss of the Patents, incurrence of unreimbursed patent expenses, exposure to third-party claims by automakers who are current, former, or potential Flex or Flex AP customers, with damages to be proven at trial.

157.   In doing the acts alleged in this Complaint, Ricci acted with fraud and/or malice as defined in Cal. Code Civ. § 3294, therefore entitling Flex AP to punitive damages and attorney's fees and costs.

**COUNT IV**

**Misappropriation of Trade Secrets in Violation of California Uniform Trade Secrets Act**
**(Cal. Civ. Code §§ 3426 *et. seq.*)**

158.   Flex AP incorporates and realleges by reference the allegations above as if fully set forth herein.

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

24

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

159.    Ricci improperly retained Flex and Flex AP's confidential information when he departed Flex. The confidential Flex and Flex AP information that Ricci retained after his employment terminated, including those described above in paragraphs 111-113, are trade secrets as defined in Cal. Civ. Code 3426.1(d).   The confidential Flex and Flex AP information that Ricci retained is not generally known or readily ascertainable, and it derives independent economic value from being secret and not known to others, thereby providing Flex and Flex AP with a significant competitive advantage. The Flex and Flex AP confidential information that Ricci retained has been subject to reasonable measures to maintain their secrecy, including through confidentiality agreements and limited access within Flex and Flex AP.

160.    At the time of Ricci's departure from Flex, Ricci knew or should have known that the retention of the confidential Flex and Flex AP information was unlawful.  This was true under California law and under the Employee Proprietary Information Agreement that Ricci signed as a condition of his employment with Flex.  (Ex. 6.)

161.    Ricci misappropriated the confidential information belonging to Flex and Flex AP for his own benefit, without Flex's or Flex AP's express or implied consent or authorization, by, among other things, retaining such information improperly and using it in violation of obligations of confidentiality.  Ricci had access to the confidential Flex and Flex AP information solely due to his position at Flex.  His access and use of the confidential Flex and Flex AP information was conditioned on and limited to the work he performed for Flex and Flex AP's benefit and pursuant to the terms of the Employee Proprietary Information Agreement he signed. In fact, the Employee Proprietary Information Agreement expressly prohibits unauthorized disclosure or dissemination outside of Flex or retention of such information after his departure from Flex.   Ricci misappropriated the confidential Flex and Flex AP information despite knowing their confidential, secret, and protected nature.

162.    On information and belief, the confidential Flex and Flex AP information taken by Ricci was received, acquired, possessed, and/or used by AutoConnect.  On information and belief, AutoConnect would not have been able to continue as a going concern but for Ricci's retention of Flex and Flex AP's confidential information.

163.   On information and belief, Ricci misappropriated the confidential Flex and Flex AP information in a willful manner.

164.   Flex and Flex AP did not discover Ricci's misappropriation until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them, tolling the statute of limitations (Cal. Code Civ. § 3426.6) under the discovery rule and equitable tolling principles.

165.   As a proximate cause of Ricci's misappropriation of Flex and Flex AP's confidential information, Flex AP has suffered and will continue to suffer damages, and Ricci will be unjustly enriched in sums not yet ascertained.

166.   To the extent Ricci is permitted to continue to misappropriate and possess the Flex and Flex AP confidential information, Flex AP will suffer immediate and irreparable harm.  Flex AP therefore asks for the return of Flex and Flex AP's confidential information, dispossession of all copies of the Flex and Flex AP's confidential information, and prohibition on any further misappropriation.

167.   In doing the acts alleged in this Complaint, Ricci acted with fraud and/or malice as defined in Cal. Code Civ. § 3294, therefore entitling Flex AP to punitive damages and attorney's fees and costs.

168.   The misappropriation of Ricci was willful so as to justify an award of exemplary damages, double damages, and/or reasonable attorney's fees under Cal. Code Civ. § 3426.3.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Flextronics AP, LLC prays for judgment against Defendant Christopher Ricci on its claims as follows:

1.   For general, special, and other compensatory damages suffered by Flex AP in an amount in excess of $1,000,000, according to proof at trial;

2.   For exemplary, double, and/or enhanced damages;

3.   For punitive damages;

4.   Disgorgement of all profits, equity, or benefits Ricci derived from AutoConnect;

FLEXTRONICS AP, LLC'S COMPLAINT

5.    Damages resulting from Ricci's misappropriation of Flex AP's confidential trade secrets;

6.    An order requiring Ricci to cause the Patents to be returned to Flex AP;

7.    For reasonable attorney's fees, costs, and expenses;

8.    For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

9.    For any other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff Flextronics AP, LLC requests a jury trial on all matters so triable.

Dated: January 6, 2026                **BRYAN CAVE LEIGHTON PAISNER LLP**

By: _/s/ (Ashley) Hyun-Jeong Kim_
    (Ashley) Hyun-Jeong Kim)
*Counsel for Plaintiff FLEXTRONICS AP, LLC*

BRYAN CAVE LEIGHTON PAISNER LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

27

FLEXTRONICS AP, LLC'S COMPLAINT