UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLEXTRONICS AP, LLC, et al.,<br>Plaintiffs,<br>v.<br>CHRISTOPHER RICCI,<br>Defendant. | Case No. 26-cv-00117-PCP<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 22, 33, 39, 40, 43, 45 |

Defendant Christopher Ricci is a former attorney and employee of plaintiffs Flextronics AP, LLC and Flextronics International USA, Inc. (together, "Flex"). Flex alleges that, shortly before leaving the company, Ricci orchestrated a deal in which Flex transferred a patent portfolio to AutoConnect Holdings, LLC under terms that were unreasonably unfavorable to Flex. According to Flex, Ricci did so because he stood to benefit from the deal: Ricci had coordinated the creation of AutoConnect with a longtime associate and had been promised a significant stake in the entity upon his departure from Flex. Yet Ricci allegedly concealed those key facts from Flex at the time, which Flex alleges would have triggered greater scrutiny of the terms of the deal. In this action, Flex asserts three state common-law claims against Ricci for fraud, fraudulent inducement, and breach of fiduciary duty, as well as one statutory claim for disclosure of Flex's trade-secret information in violation of California's Uniform Trade Secret Act (CUTSA). Ricci now moves to dismiss all claims with prejudice. For the reasons below, the motion is denied.

## BACKGROUND

Flex AP—a Colorado limited liability corporation with its principal place of business in San José, California—is the U.S.-based subsidiary of Flex Limited, a Singapore-based company

United States District Court
Northern District of California

focused on electronics manufacturing services and original design manufacturing.[1] Dkt. No. 32 ¶ 23. Flex USA is a California corporation also based in San José. *Id.* ¶ 25. The complaint does not specify whether Flex USA is owned by or otherwise affiliated with Flex Limited.

In April 2011, Ricci began working at "Flex"—the particular entity is not specified in the complaint—as Deputy General Counsel and Chief Intellectual Property Officer, i.e., as Flex's most senior IP attorney. *Id.* ¶ 74. Flex alleges that, in that role, he "owed Flex and Flex AP a fiduciary duty to act solely in [their] best interest." *Id.*

While at Flex, Ricci developed numerous patents concerning technologies like automotive interfaces. *Id.* ¶ 77. Flex attempted to develop business based on these patents through the "Topi" project, which Ricci led and which focused on vehicle connectivity and occupant health monitoring. *Id.* ¶ 79. But Flex eventually realized that the Topi patent portfolio concerned technology outside Flex's core focus areas, so it decided to "spin out Topi to attract investment while retaining a strategic relationship, including manufacturing partnerships and a potential 19.99% equity sta[k]e in the spun-out entity." *Id.* ¶ 82. In the meantime, Flex funded Topi's efforts to develop the patent portfolio, including covering the costs of patent applications and maintenance fees.

Unbeknownst to Flex, Ricci allegedly intended to use the spin-out of Topi to his own benefit by working with his associates Peter Sousa and Greg Hershenson to secure the transfer of the Topi patent portfolio to the three men under extremely favorable terms. *Id.* ¶ 75. In emails to a venture capitalist in April 2014, Ricci stated that he was "considering going out the door [i.e., leaving Flex] with" the patent portfolio, would engage Hershenson as the "banker" for the transaction, and "would move over" from Flex to the Topi spin-out entity "[w]hen the product launche[d]." *Id.* ¶ 88–90. In January and February 2015, Ricci stated in emails to Suorsa that he "ha[d] been talking … about 'selling' [Suorsa] the technology and IP" and had "started the process of 'selling' Topi to [Suorsa]." *Id.* ¶¶ 96–97. Ricci put the word "selling" in quotes, suggesting that

[1] For the purposes of Ricci's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court as true the allegations in Flex's operative first amended complaint. Unless otherwise noted, the Court refers to the first amended complaint as "the complaint."

United States District Court
Northern District of California

it did not carry its usual meaning. The next month, Ricci suggested in an email to Hershenson that, "rather than dealing with the acquisition of a company (Topi)," Hershenson should "just create [his] own shell and transfer the assets [i.e., patent portfolio] into it," and it would "make[] the sale cleaner." *Id.* ¶ 101. Hershenson replied the next day that the shell entity "w[ould] be called Autoconnect Holdings LLC." Over the next week, Ricci advised Suora on using AutoConnect's corporate form to shield themselves from liability by ensuring that, in any litigation, "they can't pierce the corporate veil." *Id.* ¶ 103. A few days later, in late February 2015, AutoConnect was formed in Delaware. *Id.* ¶ 105. Flex argues that these facts support an inference that Ricci intended to take a financial stake in AutoConnect after his departure from Flex and expected litigation to result from his double-dealing.

Ricci then advised AutoConnect on its acquisition of the Topi patent portfolio while still acting as Flex's lead IP attorney.

On Flex's behalf, Ricci "oversaw the negotiations between Flex AP and AutoConnect over the terms of the sale of the Patents to AutoConnect." *Id.* ¶ 113. For example, "Ricci's subordinate Rob Cronan drafted many of the documents … at Ricci's direction and under Ricci's control," often "check[ing] in with Ricci for Ricci's approval." *Id.* ¶ 114. According to a March 2015 email from Suorsa, Ricci also approved one of the contracts between Flex and Autoconnect in March 2015, and Suorsa has since testified that he understood that "[Ricci] ha[d] final approval on [the contract]" on Flex's end. *Id.* ¶ 115.

Suorsa also testified that Ricci had simultaneously provided assistance to AutoConnect during this period. *Id.* ¶ 108. In May 2015, for example, Ricci provided advice to Suorsa and AutoConnect on a transaction document, suggesting language to resolve Suorsa's concerns over Flex's retention of certain decision-making authority concerning the patent portfolio. *Id.* ¶ 116. The next day, Hershenson (at AutoConnect) emailed Cronan (Ricci's subordinate at Flex) proposing "new language" based on "comments by [AutoConnect's] advisory team," allegedly in reference to Ricci. *Id.* ¶ 117. The following week, Ricci also "forwarded Suorsa spreadsheets showing Flex AP's automotive patent portfolio" and asked Suorsa to "let [him] know what you think from the not included list that we should include"—that is, Ricci asked Suorsa which of

Flex's patents to transfer to AutoConnect.

On May 20, 2015, Flex transferred the Topi patent portfolio to Autoconnect in exchange for a secured convertible promissory note for $500,000. *Id.* ¶¶ 1, 122. The terms of the agreement did not provide any license for Flex or its customers to practice the patents in the portfolio. *Id.* "As Flex's Deputy General Counsel and Chief Intellectual Property Officer, Ricci … signed off on the terms of the transfer on behalf of Flex AP." *Id.* ¶ 124.

In the months following the May 2015 transfer of the Topi patent portfolio to AutoConnect, Ricci purportedly acted to secure further benefits for AutoConnect at Flex's expense. In July 2015, Suorsa raised concerns to Ricci that the maintenance costs associated with the patent portfolio might be unaffordable "in the event [they] were unsuccessful in funding [AutoConnect] or licensing it or striking any deal for the sale of the portfolio." *Id.* ¶ 128. Ricci gave notice of his intent to resign from Flex the next month, on August 31. Just a few days later, Ricci presented Ben Tabler—a Flex attorney who reported directly to Ricci—with a draft of a first addendum to the agreement between Flex and Autoconnect. *Id.* ¶ 132. The first addendum "obligates Flex AP to reimburse AutoConnect for certain patent maintenance fees should Flex AP ever declare an Event of Default" under the agreement. *Id.* Ricci "actively pushed" for the addendum, which was his "brainchild," by "instruct[ing] his subordinate Tabler to ask Stewart to sign" it. *Id.* ¶ 133. Tabler presented the first addendum to Tim Stewart, an attorney authorized to sign on Flex's behalf, on September 17, 2015. *Id.* ¶ 136. "Consistent with []his role" as an authorized signatory, "Stewart did not conduct any independent investigation into the nature of the transaction. Stewart signed the [f]irst [a]ddendum based on Ricci's instruction—conveyed through Tabler—that the deal should be signed." *Id.* The agreement was executed on October 22, 2025, after Ricci left Flex.

In effect, the first addendum "ensure[d] AutoConnect's patent prosecution and maintenance fees would be reimbursed by Flex AP upon exercising its security interests," which "presented Flex a lose-lose scenario: either take no action in response to AutoConnect's failure to pay the amounts due to Flex or reacquire the [p]atents and reimburse AutoConnect for the maintenance costs." *Id.* ¶ 132. This "effectively reduced the value of the [n]ote to Flex AP to zero,

because the [a]ddendum created an escalating Flex AP liability for covered patent prosecution fees and costs should Flex AP ever seek to recover the [p]atents." *Id.* ¶ 135. According to the complaint, "[i]t was entirely predictable to a trained patent lawyer, and Ricci must have known, that by mid-2017 Flex AP's reimbursement obligation likely would equal or perhaps even exceed $500,000," the value of the note. *Id.*

The complaint alleges that "[b]ecause Ricci was the only trained patent lawyer involved in the transaction on Flex's behalf," the "unfairness and imbalance" of the note and first addendum were not readily apparent to Flex. And because Ricci did not "inform Flex AP of [hi]s financial interest in AutoConnect or … that [he] was also providing legal advice to AutoConnect," *id.* ¶ 114; *see also id.* ¶ 131, others at Flex relied on Ricci's loyalty to Flex and did not subject his proposed terms to significant scrutiny. For example, Cronan (Ricci's subordinate) "was not informed at the time he worked on the [n]ote that Ricci had a financial interest in AutoConnect, that Ricci expected shortly to be a part owner of AutoConnect, or that Ricci was at the same time advising AutoConnect and its principals regarding the transaction." *Id.* ¶ 125. "Likewise, Tim Stewart," who signed all the transaction documents on Flex's behalf, did so "in reliance on Ricci's representations regarding the transaction and on Ricci's good faith and fiduciary obligation to Flex and Flex AP" and "was not informed at the time … that Ricci had a financial interest in AutoConnect, … expected shortly to be a part owner" or had been "advising AutoConnect." *Id.* ¶ 126. Flex alleges that if it "were aware of … Ricci acting on both sides of the transaction in 2015," it "would not have entered into the [n]ote especially not without further inquiry." *Id.* ¶ 123; *see also id.* ¶ 134.

Around the time he began pushing for the first addendum to be signed, Ricci also "instructed Flex employees that Flex should continue paying AutoConnect's patent and prosecution maintenance fees" until the first addendum had been signed. *Id.* ¶ 131.

Ricci left Flex on September 17, 2015. *Id.* ¶ 137. "Ricci's employment file allowed him to keep [a] laptop" from Flex. *Id.* ¶ 144. But that authorization did not extend to the proprietary data stored therein. To the contrary, as part of his employment, Ricci had signed Flex's employee proprietary information agreement, which required that:

> When [he] le[ft] the employ of the Company, [he] w[ould] deliver to [Flex] any and all drawings, notes, memoranda, specifications, devices, formulas, client/customer lists and documents, together with all copies thereof, and any other material containing or disclosing any
>
> [Flex] Inventions, Third Party Information or Proprietary Information of [Flex].

*Id.* ¶ 143. Ricci nevertheless retained roughly 1,700 documents on the laptop.

After leaving Flex, Ricci briefly went to work at a company called NextEV. But by late October 2015, he was "already doing what he referred to as 'beer consulting' for AutoConnect" by reviewing the finalized first addendum. *Id.* ¶¶ 147–48. Ricci contributed funds to AutoConnect for the first time on October 29, 2015, as documented by an email from Hershenson to Suorsa. *Id.* ¶ 151. And Ricci currently owns 47.5% of AutoConnect and is its "head honcho." *Id.* ¶ 152.

After several extensions of the maturity date, the note finally came due on October 21, 2017, but "AutoConnect was unable or unwilling to pay the amounts owed." *Id.* ¶ 155. Flex proposed to grant another extension in exchange for licensing rights, but AutoConnect refused. *Id.* ¶ 156. At the time, Flex elected not to demand payment and thereby trigger an event of default. *Id.* ¶ 158. But in 2024, AutoConnect sued several automakers in a Texas district court for infringement of the Topi patents based on the automakers' use of systems supplied by Flex. *Id.* ¶ 159. That prompted Flex to begin the investigation that revealed Ricci's ties to AutoConnect and resulted in this action.

In June 2025, Flex sent AutoConnect a written notice of default, demanding that AutoConnect satisfy its obligations under the note, but AutoConnect failed to pay and defaulted. AutoConnect then refused to return the patents despite its default. *Id.* ¶¶ 161–64.

Based on evidence uncovered in the Texas patent-infringement litigation, which revealed Ricci's dealings with AutoConnect during his time at Flex, Flex filed this action in January 2026. After Ricci moved to dismiss the original complaint, Flex filed a first amended complaint, which is the operative pleading. Now before the Court is Ricci's motion to dismiss that complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a

claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Fraud-based claims are subject to a heightened pleading requirement under Federal Rule of Civil Procedure 9(b). When "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading of fraud must be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). But even under this heightened standard, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## ANALYSIS

### I. Ricci's motion to dismiss is denied.

Ricci moves to dismiss all of Flex's claims as untimely and inadequately pleaded. Because the complaint alleges sufficient facts to establish that Flex's claims either did not accrue or were

United States District Court
Northern District of California

tolled and to satisfy the applicable pleading standards, the Court denies Ricci's motion.

**A. Flex's claims are timely.**

Each of Flex's claims are subject to a three-year limitations period under California law. *See* Cal. Civ. Proc. Code § 338(d) (fraud); *id.* § 3426.6 (trade-secret misappropriation); *Kanaan v. Yaqub*, 799 F. Supp. 3d 960, 965 (N.D. Cal. 2025) (fiduciary duty claims grounded in fraud). Ricci argues that all of Flex's claims are time-barred because each accrued beginning no later than September 2015, when Ricci left Flex, such that the limitations period ended in September 2018. But Flex's claims are timely if it only belatedly discovered the alleged conduct challenged in this action.

Flex's CUTSA cause of action did not accrue until Ricci's alleged misappropriation was "discovered or by the exercise of reasonable diligence should have been discovered." Cal. Civ. Code § 3426.6. As Flex argues, the allegations in the complaint suggest that Flex learned of Ricci's retention of the trade-secret materials and disclosure and use thereof only in June 2025, when AutoConnect produced some of those documents to Flex in discovery in the Texas litigation. Dkt. No. 32 ¶ 205. Nothing in the complaint suggests that Flex could or should have learned of Ricci's retention of the documents earlier than 2025.

Flex concedes that the common-law claims accrued by no later than September 2015 and would ordinarily have expired by September 2018. But Flex argues that the claims were tolled due to Ricci's fraudulent concealment of his unlawful actions. "When a plaintiff alleges the fraudulent concealment of a cause of action, the same pleading and proof is required as in fraud cases: the plaintiff must show (1) the substantive elements of fraud, and (2) an excuse for late discovery of the facts." *Tseng v. PeopleConnect, Inc.*, 665 F. Supp. 3d 1136, 1149 (N.D. Cal. 2023).

Flex has adequately pleaded the substantive elements of fraud. To establish the second element (i.e., an excuse for late discovery), Flex must allege "(1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Id.* (quoting *Finney v. Ford Motor Co.*, No. 17-CV-06183-JST, 2018 WL 2552266, at *3 (N.D. Cal. June 4, 2018)). Flex's complaint does all three. It alleges that Flex "did not discover

Ricci's self-dealing until 2025, when Flex AP responded to discovery requests issued by automakers GM and Toyota in connection with AutoConnect's lawsuits against them. Documents reviewed as part of Flex AP's investigation revealed an orchestrated scheme to transfer the Patents to AutoConnect for minimal consideration." Dkt. No. 32 ¶ 167. And the complaint explains that "Flex and Flex AP could not have reasonably discovered Ricci's fraud until 2025" because "[p]rior to being notified by Ford, GM, and Toyota of Ricci's alleged conduct, and reviewing documents in preparation for and in response to a third-party subpoena from GM and Toyota, Flex AP reasonably relied on Ricci's representations as Flex's Deputy General Counsel and Chief Intellectual Property Officer and had no occasion to investigate potential malfeasance by Ricci." *Id.*

Ricci argues that several events before 2025 should have triggered Flex's investigation of his dealings with AutoConnect.

First, Ricci points to a 2017 email from Rob Cronan (a Flex attorney) to Gregg Hershenson (at AutoConnect) concerning the two entities' ongoing negotiations. Cronan noted in the email that: "Chris Ricci has been inserting himself into this and my boss [Flex's general counsel] has asked that I follow-up. He wanted me to follow-up with Chris but I prefer to continue working with you. Chris is welcome to join." Dkt. No. 21-4 at 1. Ricci contends that this email shows that Flex knew by 2017 that Ricci was working with AutoConnect on a deal in which Ricci had previously represented Flex. In Ricci's view, this should have prompted investigation into Ricci's earlier actions in structuring the transaction. But this email is not attached as an exhibit to the complaint, nor has Ricci moved for judicial notice of the email, so the Court cannot consider it at the pleading stage. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). In any event, drawing all reasonable inferences in Flex's favor as the non-moving party, the Court is unable to conclude that the email would prompt a reasonable company to investigate Ricci's conduct at Flex. The email could simply show that AutoConnect hired Ricci *after* he left Flex to consult on a matter about which he was already knowledgeable. That might have raised some ethics questions, but it does not necessarily suggest that Ricci had engaged in fraud when structuring the deal. And the email does not show that Flex understood Ricci to be a primary representative for or intimately

involved with AutoConnect. To the contrary, Cronan expresses a desire to sideline Ricci because Cronan viewed him as inappropriately "inserting himself" into a matter that only tangentially involved him.

Second, Ricci suggests that Flex was put on notice of his intimate dealings with AutoConnect by "a publicly available filing, dated May 9, 2016, with the Delaware Secretary of State showing Ricci's partial ownership of AutoConnect." Even if the Court takes judicial notice of this filing, as Ricci requests, it does not show notice to Flex. There is no reason to assume that Flex, which is not based in Delaware, would have been aware of AutoConnect's public filings in that state.

Third, Ricci argues that Flex was on notice because the complaint alleges that "[t]hroughout the summer of 2015, Ricci forwarded confidential, privileged information from Flex AP's patent counsel to [AutoConnect leadership]." Dkt. No. 32 ¶ 129. But as Flex argues, nothing in the complaint suggests that Flex had reason to comb through Ricci's work emails before 2025. Nor has Ricci shown that *every* reasonable company would monitor (or retroactively examine) employees' emails with external parties.

For these reasons the complaint pleads a sufficient basis for fraudulent-concealment tolling of the common-law causes of action.

**B. Flex's fraud and fraudulent inducement claim satisfy Rule 9(b).**

Ricci argues that Flex has not pleaded its claims for fraud and fraudulent inducement with the particularity required by Rule 9(b). In California, common-law claims for fraud and fraudulent inducement of a contract have the same elements. *Thompson v. Carmax*, No. 23-CV-01364-JCS, 2023 WL 2934929, at *4 (N.D. Cal. Apr. 13, 2023). A plaintiff claiming either fraud or fraudulent inducement must allege "(1) misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of the falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1068–69 (E.D. Cal. 2012) (citing *Lazar v. Superior Court,* 12 Cal.4th 631, 638 (1996)). Flex has pleaded each element with the requisite particularity.

First, Flex has alleged misrepresentation. As Ricci notes, the complaint does not allege any

*affirmative* misrepresentations with the particularity necessitated by Rule 9(b), which generally requires articulation of "the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (citation modified). But that is because the thrust of Flex's fraud claims is that Ricci engaged in concealment or nondisclosure, not that he made affirmatively false representations. Where, as here, a fraud claim is based on an omission, courts in this district consistently recognize that "the particularity standard" under Rule 9(b) "is lowered … as to pleading 'the time, place, and specific content of the fraudulent omission." *Flier v. FCA US LLC*, No. 21-CV-02553-CRB, 2022 WL 16823042, at *3 (N.D. Cal. Nov. 8, 2022) (citation modified). That is because, as a practical matter, "a plaintiff in a fraud by omission suit will not be *able* to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim." *Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 817 (N.D. Cal. 2019) (emphasis added) (quoting *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007)); *see also Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 660 F. Supp. 3d 863, 876 (N.D. Cal. 2023).

Here, Flex has alleged the "who" (Ricci) with particularity. The "why" (i.e., intent) is discussed below. And Flex alleges the remaining Rule 9(b) requirements with sufficient specificity to satisfy the lower bar applicable to fraud-by-omission claims. The complaint makes clear that "when" the omissions occurred was from April 2014 to September 2015 when Ricci simultaneously worked for Flex and took action to secure the transfer of the Topi patent portfolio under terms favorable to AutoConnect. Flex also alleges the "what"—that is, "that Ricci had a financial interest in AutoConnect, that Ricci expected shortly to be a part owner of AutoConnect, or that Ricci was at the same time [as he ran the deal on Flex's side] advising AutoConnect and its principals regarding the transaction." Dkt. No. 32 ¶ 125. And the complaint specifies the "how": Ricci delayed his formal involvement in AutoConnect in order to hide his connections to the entity, instead having his associates negotiate with Flex on his behalf, and then used his role as Flex's lead IP attorney to minimize scrutiny of the terms of the deal. These allegations provide sufficient "notice to allow [Ricci] to defend the charge" against him, as Rule 9(b) requires. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Neubronner v. Milken*, 6 F.3d 666, 671–

72 (9th Cir. 1993) (explaining that a pleading is "sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations").

Second, the complaint alleges Ricci's knowledge that his failure to disclose his interest in and connection to AutoConnect from Flex left the false impression that he was acting solely in Flex's best interest in his fiduciary capacity. Because "knowledge … may be alleged generally" under Rule 9(b), nothing more is required. Fed. R. Civ. P. 9(b).

Third, the complaint alleges Ricci's intent to defraud. Again, "conditions of a person's mind may be alleged generally." *Id.* That includes a "specific intent to deceive or defraud." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007). In any event, the complaint provides much more than general allegations: It points to specific emails from Ricci as early as April 2014 suggesting his intent to benefit from taking control of the Topi patent portfolio and to hide such benefit from Flex.

Fourth, Flex has alleged that it justifiably relied on Ricci misrepresentation. As detailed above, the complaint alleges that, in his role as Flex's lead IP attorney, Ricci directed his subordinate's drafting of the original terms of the agreement and drafted the first addendum himself. Though other Flex attorneys were involved in the transaction, these attorneys were not IP specialists and were acting either as Ricci's direct subordinates or merely as signatories. Flex relied on Ricci's loyalty, as he had not disclosed his interest in Autoconnect, and so did not subject the terms he proposed and approved to additional scrutiny by another IP lawyer.

Fifth, Flex has alleged damages. Ricci contends that Flex was already looking to spin out the Topi patent portfolio before he allegedly began scheming to take control of it, so Flex was not damaged by the transfer of the portfolio to AutoConnect. But the complaint alleges that Ricci crafted specific, unorthodox terms that were uniquely unfavorable to Flex. These included a requirement that Flex continue to pay the patent-maintenance costs for the portfolio after the transfer until the execution of the first addendum, the first addendum's requirement that Flex pay back any patent-maintenance costs expended by AutoConnect in the event it retook the patent portfolio, and the absence of any license for Flex or its customers to practice the patents after the

transfer. These provisions were not just harmful in theory. In practice, they caused Flex to incur additional patent-maintenance costs, dissuaded Flex from exercising its rights under the agreement with AutoConnect when Autoconnect failed to pay amounts owed in 2017, and enabled AutoConnect to subject Flex's customers to costly patent litigation in Texas based on their use of Flex-provided systems, subjecting Flex to reputational injury and possible legal action.

For these reasons, Flex's fraud and fraudulent inducement claims satisfy Rule 9(b), and Ricci's motion to dismiss the claims is denied.

**C. Flex's breach-of-fiduciary-duty claim is adequately pleaded.**

Ricci challenges the sufficiency of the allegations underlying Flex's breach-of-fiduciary-duty claim. A plaintiff alleging breach of fiduciary duty must plead facts showing (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) injury, and (4) causation. *See United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 146 F. Supp. 3d 1122, 1142 (N.D. Cal. 2015). Ricci argues, and Flex does not meaningfully contest, that Flex's breach-of-fiduciary-duty claim necessarily sounds in fraud such that it is subject to Rule 9(b)'s heightened pleading standard. *See id.* Even under that heightened standard, Flex has adequately pleaded each element.

First, Flex has pleaded the existence of a fiduciary duty. Specifically, the complaint alleges that Ricci was Flex AP's attorney and Flex USA's employee. Dkt. No. 32 ¶¶ 172–173. These relationships imposed a fiduciary duty and duty of loyalty, respectively. *See De Meo v. Cooley LLP*, 115 Cal. App. 5th 17, 29 (2025); *Skyline Advanced Tech. Servs. v. Shafer*, No. 18-CV-06641-CRB, 2021 WL 5908387, at *8 (N.D. Cal. Dec. 14, 2021). The complaint states as much, alleging that Ricci "owed Flex and Flex AP fiduciary duties of care, loyalty, and good faith," and that he "knowingly accepted these fiduciary duties through his employment as an attorney with Flex." Dkt. No. 32 ¶ 182. Ricci argues that Flex's complaint does not specify which state's law governed the parties' relationship. But "[i]t is well-settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty." *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006).

Next, Ricci argues that Flex "fails to explain with particularity how any such alleged duties were actually breached by Ricci." And he suggests that much of the conduct alleged to breach his duties to Flex occurred after he ended his attorney and employment relationships with Flex. But as

discussed above, the complaint alleges that Ricci acted during his time at Flex to craft and execute the initial deal between Flex and AutoConnect. Shortly before his departure, he also drafted the first addendum and pressed for its execution. Those agreements, crafted by Ricci while he retained a fiduciary duty to Flex, allegedly imposed onerous and unreasonably unfavorable terms on Flex—for example, requiring Flex to reimburse all of the patent-maintenance costs incurred by AutoConnect in the event that Flex retook the patent portfolio after a default, and failing to provide a license for Flex to practice the patents after the transfer. *See* Dkt. No. 32 ¶¶ 122, 132–36. That the first addendum was not finalized until after Ricci left does not obviate his liability for acting prior to his departure to prepare the addendum. And in any event, the complaint identifies other specific breaches prior to Ricci's departure, such as disclosing confidential information about the patent portfolio to AutoConnect and instructing Flex employees to delay assignment of the portfolio so that Flex would continue to pay patent-prosecution and -maintenance fees instead of AutoConnect. *See id.* ¶¶ 52–53, 118–19, 129

Finally, Ricci again argues that Flex fails to allege that his actions caused any injury or damages. These arguments fail for the same reasons discussed above with respect to the fraud and fraudulent inducement claims.

Accordingly, Ricci's motion to dismiss the breach-of-fiduciary-duty claim is denied.

**D. Flex adequately pleads its CUTSA claim.**

Ricci also moves to dismiss Flex's CUTSA claim for trade-secret misappropriation. A plaintiff alleging a violation of CUTSA must plead (1) that it possessed a trade secret and (2) that the defendant misappropriated (i.e., improperly acquired, used, or disclosed) the trade secret. *See Applied Med. Distribution Corp. v. Jarrells*, 100 Cal. App. 5th 556, 569 (2024). Although Ricci argues otherwise, Flex has established both elements.

**1. Flex USA plausibly alleges possession of the alleged trade secrets.**

Ricci first argues that Flex USA's CUTSA claim fails because the complaint "contains zero non-conclusory allegations of Flex USA's ownership of the alleged trade secrets." Dkt. No. 39 at 17. In other words, Ricci argues that Flex USA fails to plead part of CUTSA's first requirement: "possession." But the complaint alleges that "Ricci improperly retained confidential

*Flex and Flex AP* information" after the end of his employment at Flex USA, including "1,782 documents sent … to *Flex*." Dkt. No. 32 ¶¶ 139–40; *see also id.* ¶¶ 200–202. The complaint earlier defines "Flex" to refer collectively to Flex USA, Flex AP, and Flex Ltd. *See id.* ¶ 2. Given that the allegations concerning Ricci's retention of trade-secret information refer separately to "Flex and Flex AP," the use of "Flex" in this portion of the complaint must refer only to Flex USA and Flex Ltd, and supports a reasonable inference of Flex USA's ownership and possession of the alleged trade secrets.

**2. CUTSA's "reasonable particularity" standard does not apply at the pleading stage in federal court.**

Ricci next argues that the CUTSA claim fails because the complaint does not describe the nature of the alleged trade secrets with "sufficient particularity" to determine whether they are publicly available or widely known—that is, whether they are, indeed, secret. *See Nifty Techs., Inc. v. Mango Techs., Inc.*, No. 24-CV-194, 2025 WL 1826430, at *8 (S.D. Cal. July 1, 2025). This argument is based on California Civil Procedure Code § 2019.210, which provides that "[i]n any action alleging the misappropriation of a trade secret under [CUTSA], before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity." Section 2019.210 codifies a judicially created requirement "that before a trade secret defendant must submit to potentially costly litigation and discovery, the complainant should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Brescia v. Angelin*, 172 Cal. App. 4th 133, 144 (2009). Some district courts in this circuit have applied this standard at the pleading stage in CUTSA cases, requiring plaintiffs to articulate alleged trade secrets with "reasonable particularity" to survive a motion to dismiss. *See, e.g.*, *PTC Therapeutics, Inc. v. AcureX Biosciences Corp.*, No. 25-CV-04594, 2026 WL 350772, at *8 (N.D. Cal. Feb. 9, 2026); *7EDU Impact Acad. Inc. v. You*, 760 F. Supp. 3d 981, 993 (N.D. Cal. 2024). Respectfully, this Court disagrees that a CUTSA plaintiff must satisfy § 2019.210's "reasonable particularity" standard to survive a motion to

dismiss in federal court.

First, even many California courts do not apply § 2019.210 as a substantive pleading standard. Instead, these courts have explained that § 2019.210 operates at the outset of discovery to "assist[] the court in framing the appropriate scope of *discovery* and in determining whether plaintiff's discovery requests fall within that scope." *Brescia*, 172 Cal. App. 4th at 144 (emphasis added) (quoting *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 833–34 (2005)). In other words, a plaintiff who fails to articulate their alleged trade secrets with "reasonable particularity" may be precluded from pursuing discovery related to their ill-defined trade secrets. *See Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1346 (2009) (explaining that "[t]he trade secret designation mandated by section 2019.210 … limits the scope of discovery"). But that does not mean that the plaintiff's CUTSA claims should be dismissed prior to discovery. As explained in the case that § 2019.210 "was intended to codify," *Brescia*, 172 Cal. App. 4th at 144, "[o]ne who seeks to protect his trade secrets from wrongful use or disclosure does not have to spell out the details of the trade secret to avoid a demurrer to [or motion to dismiss] a complaint." *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 252 (Ct. App. 1968). That is because doing so "would mean that the complainant would have to destroy the very thing for which he sought protection by making public the secret itself." *Id.*; *see also Quintara Biosciences, Inc. v. Ruifeng Biztech, Inc.*, 149 F.4th 1081, 1088 (9th Cir. 2025) (explaining that "plaintiffs in trade secret actions may have commercially valid reasons to avoid being overly specific at the outset in defining their intellectual property … because the more precise the claim, the more a party does to tip off a business rival to where the real secrets lie" (citation modified)). There is little reason to think that § 2019.210 mandates such a result in any court.

Second, if § 2019.210's reasonable-particularity standard operated at the pleading stage in state court, it would still be inappropriate to import that standard into federal court because it is inconsistent with Federal Rule of Civil Procedure 8(a)(2). *See Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 584–86 (9th Cir. 2022) (explaining that, "in an action based on state law … if a state procedural rule conflicts with a federal procedural rule, the federal procedural rule controls."). Under Rule 8(a)(2), a complaint need not recite "detailed factual allegations" so long as it

United States District Court
Northern District of California

"contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a complaint alleging that information is secret need only support a "reasonable inference" that the information is not generally known in the relevant industry or trade. *See id.* at 663. But applying § 2019.210's "reasonable particularity" standard at the pleading stage would require significantly more. Rather than merely pleading facts from which a court could reasonably infer that information is secret, a plaintiff would be required to offer detailed allegations that delineate the claimed trade secrets from matters of general knowledge. *See PTC Therapeutics*, 2026 WL 350772, at *8 (explaining that "the CUTSA standard is more demanding" than federal pleading standards); *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1154 (E.D. Cal. 2017) (noting the "complex and fact-intensive" nature of the secrecy inquiry under CUTSA). Under the Federal Rules, that type of detailed factual showing is "better suited for summary judgment." *See Nifty Techs.*, 2025 WL 1826430, at *9 (S.D. Cal. July 1, 2025) (quoting *Bos. Sci. Corp. v. Nevro Corp.*, No. 16-1163-CFC-CJB, 2020 WL 6261624, at *4 n.7 (D. Del. Oct. 19, 2020)).

Because § 2019.210's "reasonable particularity" standard does not apply at this stage, Flex need only plead factual allegations sufficient to support an inference that its claimed trade secrets were not generally known and to provide Ricci with adequate notice of the nature of Flex's claims. It has done so. The complaint states that "[u]pon his departure, … Ricci retained at least 1,782 Flex and Flex AP documents." Dkt. No. 32 ¶ 139. "[A] large portion of these documents (~1400) were source code from the prototypes and demo units made for the Detroit Auto Show—i.e., code for the specific demo units. Of the 300 documents remaining, there are several presentations regarding the technology under development." *Id.* The complaint explains that these 300 documents included "Topi product readiness and product description memorandums, Topi strategy documents, confidential source code; internal slide decks; pitch materials; Topi cost and revenue models; agreements; client communications; and customer product specification slide decks." *Id.* ¶ 140. It is plausible that each of these categories of information, stored solely in confidential internal documents, was not generally known to those outside Flex.

Courts in this district have held that similar allegations are sufficient to state a CUTSA

claim. *See Tesla, Inc. v. Proception, Inc.*, No. 25-CV-04963-SVK, 2025 WL 3187569, at *6 (N.D. Cal. Nov. 14, 2025); *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 907–08 (N.D. Cal. 2023); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 882 (N.D. Cal. 2018). As another court in this district explained, while "[a]llegations that set out purported trade secrets in broad, categorical terms that are merely descriptive of the types of information that generally *may* qualify as protectable trade secrets are insufficient to state a claim … such categories of information become sufficient[] … for purposes of stating a claim where the complaint alleges that these categories of information are contained within specific documents." *Beluca*, 660 F. Supp. 3d at 907–08. For that reason, a different court in this district recently concluded that a plaintiff sufficiently identified its trade secrets where it "identified an Access Log with hundreds of files that were related to the development of [a new] robotic hand, … alleged that these files contained their trade secrets," and "explained that these documents fall into eight detailed categories containing highly sensitive … project information, namely: (1) engineering specifications, schematics, and blueprints, including measurements, grips, tensions, ranges of motion, and degrees of freedom; (2) tests, their results, and technical analyses; (3) models; (4) product roadmaps; (5) close-range video profiles of prototypes; (6) strategy documents; (7) vendor research; and (8) source code related to … hand motion and actuators." *Tesla*, 2025 WL 3187569, at *6. So too here, Flex's anchoring of broad categories of plausibly confidential information in a closed set of documents is sufficient.

Ricci argues that some of the 1,400 documents containing demo-unit source code cannot be trade-secret information because one of the exhibits to the complaint notes that "much of that source code is from various open source libraries." *See* Dkt. No. 39 at 20 (quoting Dkt. No. 32-12 at 2). But that still leaves at least 300 other documents containing identified categories of confidential information other than open-source code. Flex has explained that those 300 documents are the focus of its CUTSA claim.

Ricci also asserts that some of the claimed trade secrets may have been disclosed in the patents at issue in this case and the underlying patent applications. The complaint provides no allegation to that effect, and Ricci's speculation cannot be credited at this stage.

United States District Court
Northern District of California

Finally, Ricci contends that Flex had no reasonable expectation of maintaining the secrecy of the claimed trade secrets because Flex allowed Ricci to keep the laptop on which the information was stored upon his departure from the company. Neither common sense nor the allegations in the complaint require the conclusion that a company that allows a departing employee to keep a laptop necessarily authorizes him to retain the information stored on that laptop or to share the information with others.

Flex has satisfied its burden to plausibly alleged that the information at the heart of its CUTSA claim is secret, and that is all that is required at this early stage.

**3. Flex has adequately pleaded that the claimed trade secrets had independent economic value.**

Ricci also argues that Flex fails to state a viable CUTSA claim because the complaint does not support an inference that the claimed trade secrets had independent economic value.

Under CUTSA, information qualifies as a trade secret only if it "derives independent economic value, actual or potential, from not being generally known[.]" Cal. Civ. Code. § 3426.1(d). "To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (citation modified). "A plaintiff may show independent economic value by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Id.* (citation modified). "[T]he standard to show that trade secrets derive independent economic value is not a high standard," but mere recitation of the element is not sufficient to state a claim. *Id.* at *4.

Here, Flex clears the low bar for alleging independent economic value. As Flex argues in its opposition, the complaint alleges that:

> Flex funded the Topi project for years, spending on patent development, applications, and portfolio maintenance—an investment AutoConnect later spent nearly $2 million to continue; Flex maintained confidentiality agreements, limited access, and the Employee Proprietary Information Agreement requiring return of all confidential materials upon departure; and AutoConnect assumed a

> $500,000 [n]ote while its principals invested over a million dollars to acquire and develop the technology reflected in these documents.

Dkt. No. 42 at 23 (citing Dkt. No. 32 ¶¶ 4–6, 79–83, 143, 300). That is more than enough to infer that the claimed trade secrets had at least potential independent economic value.

**4. Flex has plausibly alleged disclosure.**

Ricci insists that the complaint fails to plead the second element of a CUTSA claim: misappropriation. As noted above, misappropriation can consist of improper acquisition, disclosure, or use of a trade secret. *See Applied Med.*, 100 Cal. App. 5th at 569. Here, Flex alleges all three.

First, Flex alleges that Ricci retained the above-described documents that were stored on his work laptop. And the complaint specifically alleges that such retention violated Flex's "employee proprietary information agreement," to which Ricci had agreed as a condition of his employment. *See* Dkt. No. 32 ¶ 143. A departing employee's retention of trade-secret information without permission amounts to improper acquisition sufficient to allege misappropriation under CUTSA. *See VibrantCare Rehab., Inc. v. Deol*, No. 2:20-CV-00791, 2021 WL 1614692, at *4 (E.D. Cal. Apr. 26, 2021); *TGG Mgmt. Co. Inc. v. Petraglia*, No. 19-CV-2007, 2020 WL 209103, at *5 (S.D. Cal. Jan. 14, 2020).

Second, Flex alleges that Ricci disclosed the trade secrets to AutoConnect and used them in furtherance of AutoConnect's business activities. As a factual basis for that assertion, Flex alleges that AutoConnect "could not have continued as a going concern" without those documents, which "formed the foundation of AutoConnect's business model," and that AutoConnect's recent patent-infringement lawsuits against Flex customers assert "the same foundational architecture underlying the Topi system." Dkt. No. 32 ¶¶ 140–42.

Ricci argues that these allegations impermissibly rely on the "inevitable disclosure doctrine," a "doctrine that permits an inference of misappropriation when an employee's roles at two different companies 'were so similar that it would be impossible for an employee to perform his or her new job without using or disclosing those trade secrets.'" *PTC Therapeutics*, 2026 WL 350772, at *7 (quoting *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 708 (9th Cir. 2003)). To be

sure, California courts have held that "the inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets" because it would "create[] a de facto covenant not to compete" that "is inconsistent with California law." *Id.* (citation modified). But that simply means a court cannot infer misappropriation from "conclusory allegations" that a defendant's prior and current jobs are so similar that the defendant must have used trade-secret information from the former in performing the latter. *Id.*

That is not the case here. Rather than rely on conclusory allegations that Ricci's work for Flex and AutoConnect was similar, Flex grounds its allegations of use and disclosure in the fact that Ricci allegedly retained specific documents containing trade secrets and that "the same foundational architecture" described in those documents later appeared in AutoConnect's filings in patent-infringement actions. These allegations "that [Ricci] had access to the information through [his position at Flex] and used it for [Autoconnect]'s benefit" are sufficient. *Versata Software, Inc. v. Configit A/S*, No. 20-CV-09019, 2021 WL 5536287, at *10 (C.D. Cal. Sept. 10, 2021). "There is no requirement that a plaintiff plead exactly how a defendant … used the alleged trade secret, and it would be unreasonable to require a plaintiff to demonstrate the precise ways in which a defendant may have used the trade secrets, given that a defendant is the only one who possess such information." *Id.* (citation modified) (quoting *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015)).

**5. Flex need not plead that it suffered monetary damages.**

Ricci argues that Flex's CUTSA claim fails because the complaint "failed to say how, why, or in what amount [Flex] w[as] injured from the loss of them, or how Ricci was supposedly unjustly enriched by them." Dkt. No. 39 at 22. But that goes only to the appropriate remedy in the event Ricci is held liable for trade-secret misappropriation, not whether Flex has stated a claim. *See Applied Med. Distribution Corp. v. Jarrells*, 100 Cal. App. 5th 556, 570 (2024) ("By its terms, the California UTSA does not require proof of causation or damages as elements of a claim for misappropriation. To the contrary, the California UTSA identifies damages as a *remedy* that is available once misappropriation has been established.")

United States District Court
Northern District of California

* * *

Because Flex's complaint adequately pleads each element of a CUTSA claim, the Court denies Ricci motion to dismiss that claim.

**6. Ricci is not entitled to fees and costs.**

Finally, Ricci also requests attorney's fees and costs under CUTSA. An award of attorney's fees and costs is appropriate only where a trade-secret claim is "objectively specious" and brought in "subjective bad faith." *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (2009) (citation modified); *Swarmify, Inc. v. Cloudflare, Inc.*, No. 17-cv-06957-WHA, 2018 WL 4680177, at *2 (N.D. Cal. Sept. 28, 2018). As explained above, Flex's CUTSA claim is far from specious and is at least plausible, so Ricci's request for fees and costs is denied.

**II. The parties' sealing motions are denied.**

In connection with Flex's original and amended complaints and the briefing on Ricci's motion to dismiss, the parties filed several administrative motions to seal portions of the complaints, the parties' briefs, and the exhibits to those documents.

The public has a longstanding and well-recognized "right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Public access bolsters "understanding of the judicial process" and "confidence in the administration of justice," and it provides a "measure of accountability" for courts. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). There is thus a "strong presumption in favor of access" to court records. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

To overcome this strong presumption, a party who wishes to seal a court record must generally "articulate compelling reasons supported by specific factual findings ... that outweigh the general history of access and the public policies favoring disclosure." *Id.* at 1178–79 (citation modified). "Under this stringent standard," the Court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Auto Safety*, 809 F.3d at 1096–99. Sealing may be justified, for example, when court records "might be used … as sources of business information that might harm a litigant's competitive standing." *Id.* at 1097

(quoting *Nixon*, 435 U.S. at 598–99). But the mere invocation of vague concerns about competitive harm are insufficient to carry a movant's burden of overcoming the strong presumption of public access with a specific factual showing of the harm that disclosure will reap. *See Kamakana*, 447 F.3d at 1178; *In re Meta Pixel Tax Filing Cases*, No. 22-CV-07557-PCP, 2025 WL 1872974, at *3 (N.D. Cal. May 9, 2025). Accordingly, the local rules require the party seeking to seal to provide "a specific statement" of the reasons for doing so, explaining the interests that warrant sealing and the injury that will otherwise result. Civ. L.R. 79-5(c)(1), (f)(3).

The parties appear not to have researched the standards governing sealing in this circuit. Without citing any in-circuit authority in any of their five sealing motions, the parties insist that the Court should grant their requests because "[g]ood cause exists to seal" the material they seek to protect. That is not the applicable standard. To be certain, the Ninth Circuit "ha[s] 'carved out an exception' for sealed materials attached to a discovery motion unrelated to the merits of a case," under which "a party need only satisfy the less exacting 'good cause' standard." *Auto Safety*, 809 F.3d at 1097 (quoting *Foltz v. State Farm Mutual Auto. Insurance Company,* 331 F.3d 1122, 1135 (9th Cir. 2003)). "The 'good cause' language comes from [Federal Rule of Civil Procedure] 26(c)(1), which governs the issuance of protective orders in the discovery process," *id.*, and which the parties cite in their motions. But the documents the parties seek to seal were not filed in connection with "discovery motions," and it is beyond serious dispute that the documents are "more than tangentially related to the merits of [this] case," so as to trigger the usual compelling-reasons standard. *Id.* at 1097, 1101. The documents subject to sealing requests here are (or were filed with) Flex's complaints, which control what the merits of the case are, and Ricci's motion to dismiss this action on the merits. *See NJOY, LLC v. Imiracle (HK) Ltd.*, No. 24-CV-00397, 2024 WL 4774890, at *2 (S.D. Cal. 2024) (explaining that complaints, motion-to-dismiss briefing, and associated exhibits are subject to the compelling-reasons standard).

The parties have not come close to satisfying the compelling-reasons standard. Three of the five sealing motions merely state that sealing is necessary "to protect confidential and proprietary business information." The other two motions offer only slightly more specificity as to the nature of the information at issue—noting, for example, that proposed redactions concern "negotiations

involving the sale and purchase of intellectual property, and proprietary financial information, including information related to third-party investments.” But none of the motions identify specific harms that would result from the disclosure of such information, let alone explain why such harms would be significant enough to overcome the strong presumption of public access. *See Kamakana*, 447 F.3d at 1178; Civ. L.R. 79-5(c)(1), (f)(3). This Court has repeatedly warned that “vague and conclusory assertions that the information [a party] seeks to redact … would cause competitive harms or reveal confidential information … provide the Court with an inadequate explanation of how public dissemination of the specific material it seeks to seal would harm its competitive standing.” *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 23-CV-02091-PCP, 2025 WL 4110870 (N.D. Cal. Dec. 29, 2025) (quoting *In re Meta Pixel Tax Filing Cases*, 2025 WL 1872974, at *3).

Absent explanation from the parties, the Court is unable to conclude that compelling reasons exist for their sealing requests. Nothing on the face of the documents suggests that the information the parties seek to withhold is particularly sensitive, as most of the information concerns communications and events from 2015 to 2017. *See White v. Symetra Assigned Benefits Serv. Co.*, No. 20-CV-1866, 2022 WL 1136804, at *5 (W.D. Wash. Apr. 18, 2022) (“It is not self-evident that these records—which are ten or more years old—provide to competitors much more than historical insight into Defendants’ business operations.” (citations omitted)). Nor does the fact that the documents are subject to a protective order in separate litigation in the Eastern District of Texas require sealing in this action. As just discussed, protective orders are governed by the good-cause standard prescribed by Rule 26(c)(1), which is “less exacting” than the “stringent” compelling-reasons standard applicable here. *Auto Safety*, 809 F.3d at 1096–97. So the existence of the protective order in the Texas litigation bears little on the parties’ instant sealing requests.

Accordingly, the Court denies the parties’ sealing motions. The parties shall file unredacted copies of the documents filed provisionally under seal to the public docket within 14 days of this order.

**CONCLUSION**

For the foregoing reasons, Ricci's motion to dismiss (Dkt. No. 39) and the parties' administrative sealing motions (Dkt. Nos. 22, 33, 43, and 45) are DENIED.

**IT IS SO ORDERED.**

Dated: August 3, 2026

P. Casey Pitts
United States District Judge